UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ALLEN WALBURN,

                    Plaintiff,

vs.                          Case No. 2:04-cv-194-FtM-33DNF

CITY OF NAPLES, FLORIDA, a
political subdivision of the
State of Florida,

                    Defendant.
_____/

**ORDER**

     This matter comes before the Court on Defendant City of
Naples' Motion for Partial Summary Judgment (Doc. # 55) and
Memorandum in Support (Doc. # 56) as well as the City of Naples'
Motion for Summary Judgment (Doc. # 59) and Memorandum in Support.
(Doc. # 60).[1]  Plaintiff Allen Walburn has filed a single response
to Defendant's multiple summary judgment motions.[2] (Doc. # 77).

---

     [1] Defendant attempted to file the motion for summary judgment
on Counts I and III on February 1, 2005 (Doc. # 43); however, an
error in filing occurred, and Defendant refiled its motion for
summary judgment on Counts I and III on March 16, 2005. (Doc. #
59).  Defendant filed its motion for partial summary judgment on
Count II on March 4, 2005. (Doc. # 55).

     [2] Although Plaintiff filed his "Memorandum of Plaintiff in
Response to Defendant's Motion for Partial Summary Judgment" (Doc.
# 64) on March 17, 2005, such filing is not, in fact, a response in
opposition to Defendant's motion for partial summary judgment;
rather, it is a motion to strike Defendant's motion for partial
summary judgment.  Plaintiff's so labeled "Memorandum of Plaintiff
in Response to Defendant's Motion for Partial Summary Judgment"
does not address the legal issues raised in Defendant's motion for
partial summary judgment.  Instead, Plaintiff's filing notes that
Defendant's motion for partial summary judgment was filed out of
time.  Plaintiff seeks an order striking Defendant's motion for

Also before the Court is the City of Naples' Request for Judicial Notice. (Doc. # 38).

Although Defendant has filed two separate motions for summary judgment, this Court finds it appropriate to address both motions simultaneously because, taken as a whole, the motions seek summary judgment on all counts of Plaintiff's complaint.[3]

Having carefully considered the pleadings, answers to interrogatories, depositions, and other submissions of the parties, this Court determines that Defendant's motions for summary judgment should be granted, and Plaintiff's verified complaint should be dismissed with prejudice.

---

partial summary judgment for this reason, and because the motion is "without substance." (Doc. # 64 at 4). Plaintiff's request that this Court strike Defendant's filing is **DENIED**.

It should be noted that Plaintiff has responded substantively to both Defendant's motion for partial summary judgment and Defendant's motion for summary judgment. (Doc. # 77).

[3] This Court agrees with Plaintiff's statement in his response to Defendant's dual motions for summary judgment that "[t]he unusual bifurcated approach to summary judgment is confusing, and it manages to sidestep Rule 3.01(c) of the Local Rules of this District, which would limit a single memorandum to a length of twenty pages. The two motions and their supporting memoranda contain a total of forty-eight pages of arguments and demands." (Doc. # 77 at 2). Plaintiff requests that this Court strike the "pages in excess of the page limit." (Id.) It would not serve the ends of justice to strike the pages of Defendant's memoranda which exceed the twenty-page limit. However, the Court warns Defendant that future attempts to sidestep the Local Rules of this Court will not be tolerated.

## I.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996)(citing <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993)).  A fact is material if it may affect the outcome of the suit under the governing law.  <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997).  The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  <u>Hickson Corp. v. N. Crossarm Co., Inc.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004)(citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).  "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions,

answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffrey v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988)(citing Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)). However, if non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981), cert. denied, 456 U.S. 1010 (1982).

## II.  BACKGROUND

On March 12, 2004, Allen Walburn filed a three count complaint against the City of Naples in the Circuit Court of the Twentieth Judicial Circuit in and for Collier County, Florida. (Doc. # 1). On April 2, 2004, Defendant removed this action pursuant to 28

4

U.S.C. § 1441.

Plaintiff owns a charter vessel corporation, A and B Charters, Inc., and has leased a dock slip for his vessels from the City of Naples.  Plaintiff and the City disagree on the issue of the validity of the lease, and, if such lease is valid, they disagree on the terms of the lease agreement for the dock slip, particularly the duration of the lease.  This action has evolved from the disagreement between the parties over the duration of the lease and the manner in which both parties have attempted to assert their respective rights under the lease.  Significantly, Plaintiff contends that the City carried on a course of conduct in connection with Plaintiff's lease of the dock slip that led to Plaintiff's unlawful arrest in violation of Plaintiff's Constitutionally protected right to liberty.  In addition, Plaintiff asserts that the City has interfered with other Constitutional rights.

In Count I of his complaint, Plaintiff seeks a declaration from this Court concerning his rights under the aforementioned commercial lease between Plaintiff and the City.  In Count II, Plaintiff asserts a 42 U.S.C. § 1983 claim against the City, seeking damages stemming from the City's alleged interference with his Constitutional rights to liberty, property, and access to the courts.  In Count III, Plaintiff seeks injunctive relief, requesting that this Court bar the City from evicting Plaintiff from the property in question until this Court has addressed the

respective rights of the parties under the lease.

The City has filed a counterclaim in which it seeks a declaration that the lease in question terminated on May 31, 2004. In addition, the City has asserted the following affirmative defenses: (1) that the Lease is not valid because it purports to be a perpetual lease; (2) that Walburn has breached the Lease agreement; (3) that any arrest of Walburn was with probable cause; (4) that Walburn lacks a protected property interest in the Lease agreement and, therefore, cannot maintain a claim for violation of his constitutional rights arising from the Lease; (5) that the City is protected by qualified immunity; (6) that the doctrine of respondeat superior is not applicable to the City for conduct of its officers; (7) that Plaintiff's claims are barred by the statute of limitations; and (8) that the Lease is not valid because it was executed without proper authority from the City Council.

Both parties seek attorney's fees and costs.

## III. **ANALYSIS**

### A. **Jurisdiction**

Pursuant to 28 U.S.C. § 1331, federal courts have subject matter jurisdiction over federal questions, which are questions arising under the laws of the United States or an Act of Congress regulating commerce.  "An action 'arises under' federal law when it is apparent from the face of the plaintiff's complaint that the plaintiff's cause of action is itself created by federal law."

6

<u>Harris v. McDonald's Corp.</u>, 901 F.Supp. 1552, 1555 (M.D. Fla. 1995).  Plaintiff asserts federal question jurisdiction on the face of his complaint based on his claims pursuant to 42 U.S.C. § 1983, and therefore, this Court has jurisdiction.

    B.   **Counts I and III**

       **The Lease**

    At the core of this dispute is the commercial lease agreement ("the Walburn Lease" or "the Lease") for dock slip number 79 at the City's municipal dock, which both Walburn and the City signed.[4] Plaintiff contends that he signed the Lease on May 1, 1999, and that Defendant signed the Lease on October 8, 1999.[5]  Defendant has

_____

[4] The City has filed a "complete" version of the Walburn Lease as an attachment to its motion for summary judgment. (Doc. # 59-2). The Walburn Lease, which is about three pages in length, bears the signature of both Plaintiff and Donald J. Wirth, Director of Community Services Department of the City of Naples.

[5] Plaintiff asserts in his verified complaint, "[o]n or about May 1, 1999, Plaintiff signed a Naples Municipal Dock Commercial Lease with the City for Slip Number 79 but the City refused to sign the lease because of some additional written language placed on it by Walburn.  Subsequently, on October 8th the lease was signed by Allen Walburn and by the authorized representative of the City being the City Manager, Richard L. Woodruff." (Doc. # 2 at ¶ 4). The Court assumes that Plaintiff mistakenly stated that it was Woodruff, rather than Wirth, that signed the Walburn Lease.  No copy of the Walburn Lease filed with this Court bears Woodruff's signature.

The parties have filed several copies of the Walburn Lease throughout the course of this litigation.  (<u>See</u> Docs. # 2, # 42, # 59, and # 60).  The Leases at Docs. # 59 and # 60 were filed on the same date and appear to be identical copies.  Both Docs. # 59 and # 60 contain duplicate pages.  Doc. # 42, on the other hand, differs from Docs. # 59 and # 60 in that Doc. # 42 also contains an "addendum to Lease Sale of Business."  In addition, Docs. # 59 and # 60 bear the signature of Sheila Jameson, interim dockmaster,

stipulated in the joint pretrial statement that "[t]he Walburn lease was signed on different dates by the signatories thereto." (Doc. # 65 at 13).

As previously noted, Plaintiff operates a commercial charter boat company from the Naples City dock, Slip Number 79. (Doc. # 2 at ¶ 2). Plaintiff submits that he has been making payments as required under the Lease "including yearly increases which now total approximately $5,000.00 per year." (Doc. # 2 at ¶ 6). Plaintiff further submits that the City has accepted his payments at least until October 31, 2004. (Doc. # 2 at ¶ 6).

The term or duration of the Lease is at the center of the parties' dispute.  Concerning the Lease term, the Lease states as follows:

> 2.    TERM
> 2.1   All lease periods shall be for a five year term, unless otherwise specified.
> 2.2   The term of the Lease shall be for a period of 5 years.  The Lease term shall begin at 12:01 a.m. on the 1st day of May 1999 (the "Commencement Date") and shall end at 11:59 p.m. on the 30th day April 2004 (the "Termination Date").
> 2.3   the lease shall be reviewed annually and if all conditions of the lease are met and the Lessee has complied with all terms of the Lease and the regulations for use of the City Dock, the Lessee and the Lessor may agree to automatically extend the lease terms for an additional year.
> 2.4   The Lessor shall notify the Lessee in writing no later than October 1st of each Lease year if the Lessor objects to the automatic renewal of the

---

dated October 6, 1999.  For ease of citation, this Court shall refer to the Lease attached to Doc. # 42.  The Lease can be found at the first three pages of Doc. # 42.

> Lease for an additional year.  The Lessor shall
> specifically state terms of the lease or
> regulations of the City Dock which have been
> violated by the Lessee which have become the basis
> for the Lessor's objection  to the automatic Lease
> extension.
> 2.5  The annual renewal is a continuation/extension of
> the Lease, thereby providing the Lessee with an
> annual renewal with results in a five-year rolling
> Lease.

(Doc. # 60 at 2).

Plaintiff states that on or about July 12, 2001, the City Council determined, upon the advice of the City Attorney, Robert Pritt, that the slip rental agreement used by the City for the lease of commercial dock slips at the municipal dock should be redrafted.  (Doc. # 2 at ¶ 7-8).  Specifically, Plaintiff argues that City Attorney Pritt determined that the leases, including the Lease signed by Plaintiff in this suit, were defective because they purported to be perpetual and that the City Manager, who drafted the lease agreement, exceeded his scope in drafting, negotiating, and executing the Lease.  (_Id._)

Plaintiff contends that after July 12, 2001, the City "began a campaign" to require that Plaintiff and other individuals renting dock space execute a new lease. (_Id._ at ¶ 9).  The record contains at least three letters sent by the City to Walburn.  In letters dated October 15, 2002 and February 11, 2003, the City requested that Plaintiff enter into a new lease in the form approved by the City. (Doc. # 2, Exs. F, G).  In a letter dated May 20, 2003, the City stated that it did not intend to renew the Walburn Lease at

9

the end of the term, and gave Plaintiff the option to negotiate a new, five-year lease. (Doc. # 2 at Ex. E).

As stated <u>supra</u>, Plaintiff seeks a Court declaration that the City Manager had the authority to draft and sign the 1999 lease.[6] (Doc. # 2 at ¶ 17). Plaintiff does not argue that the Lease is perpetual, or that Plaintiff is entitled to renew the Lease into perpetuity. (Doc. # 77 at 2). Instead, Plaintiff contends that the Lease was renewed by the City until the City objected to the renewal of the Lease in 2003. (Doc. # 77 at 3). However, Plaintiff contends that because the Lease is a "rolling lease" with five-year terms, "the leasehold estate will not expire before the year 2008." (<u>Id.</u>)

In the City's motion for summary judgment (Doc. # 59), the City requests a judgment (1) declaring that Plaintiff's lease of the dock slip expired by its express terms on May 1, 2004, and that Plaintiff has no right to possession of the demised premises and that the City is entitled to immediate possession of the premises; (2) declaring that Plaintiff's lease is not perpetual because it does not express a clear and unambiguous intent for renewals in perpetuity; (3) declaring that there is no agreement between Plaintiff and the City to extend or renew the terms of the lease

---

[6] The Court notes that in discussing who executed the Lease, Plaintiff's submissions interchange the City Manager, Woodruff, and the Director of the Community Services Department, Wirth. This inconsistency is noted, but it is not material, as both individuals represent, and act on behalf of, the City.

beyond its initial term; (4) declaring that Plaintiff's lease was executed without authority from the City; (5) declaring that Plaintiff has no contractual right with the City that implicates his property interests upon which a claim for damages under 42 U.S.C. § 1983 could be predicated.

The City also seeks an award of attorney's fees and costs pursuant to the express terms of the Lease.[7]

**<u>Defendant's Arguments</u>**

Defendant argues that it is entitled to summary judgment because Plaintiff's Lease expired on April 30, 2004 (the "termination date" stated in the Lease), and the City never agreed to extend the term of the Lease beyond such termination date.   In addition, Defendant argues that Plaintiff does not have a perpetual lease, as Florida law disfavors perpetual leases, that perpetual leases must be created by clear and unambiguous language, and that such language is absent in the instant Lease, leaving Plaintiff with no perpetual lease.[8]

---

[7] Section 16 of the Lease agreement entitled "Attorney's Fees" states in pertinent part: "16.1 The Tenant agrees to pay the cost of collections and reasonable attorney's fees on any part of delinquent rental payments or other sums due hereunder that may be collected by efforts of any attorney-at-law or a collection agency, as well as attorney's fees for the enforcement of any of the provisions of the Lease." (Doc. # 42 at 3).

[8] See <u>Sisco v. Rotenberg</u>, 104 So. 2d 365, 368 (Fla. 1958) ("a covenant to renew is satisfied by one renewal thereof, due to [the courts'] disfavor of perpetuities and perpetual leases."); <u>see also</u> <u>Schroeder v. Johnson</u>, 696 So. 2d 498, 499 (Fla. 5th DCA 1997)("[T]he courts are loath to construe a covenant for renewal as

In the alternative, Defendant argues that the Lease was void ab initio because the Lease is contrary to law and the City's agent did not have the authority to draft and execute the Lease for this very reason.   Specifically, Defendant submits that the Walburn Lease, which was executed in 1999, is contrary to City of Naples Code of Ordinances Section 78-84 and Resolution 94-7108, passed on January 19, 1994.[9]

As will be discussed in greater detail infra, Plaintiff asserts that the doctrine of equitable estoppel bars Defendant from arguing that the lease agreement is void.   In addition, Plaintiff argues that the Walburn Lease is not so significantly different from the City's approved lease as to render the Walburn Lease

---

providing for more than one renewal after the expiration of the original lease, and the language of the lease with respect to renewal must indeed be clear and explicit to impel the court to construe the lease otherwise.")(citation omitted); see also Nat'l Home Communities, L.L.C. v. Friends of Sunshine Key, Inc., 874 So. 2d 631, 633 (Fla. 3d DCA 2004)("Leases in perpetuity are universally disfavored, thus the courts are loath to construe a right to renew as perpetual, and will not do so unless the language of the agreement clearly and unambiguously compels them to do so.").
     Plaintiff's response to Defendant's motions for summary judgment, however, indicates that Plaintiff does not argue that the Lease is perpetual.   Thus, the parties seem to agree that the Lease in question is not a perpetual lease.   Pursuant to the above authorities, this Court agrees that the Lease in question is not perpetual.

[9] Defendant has requested that this Court to take judicial notice of City of Naples Resolution 94-7108 as well as other municipal documents and, as will be discussed infra, this Court has agreed to take judicial notice of such adjudicative facts, particularly because Plaintiff has failed to raise an objection to this Court so taking judicial notice. See infra section IV.

contrary to law and void _ab initio_.

This Court will now address Defendant's argument that the Walburn Lease was void _ab initio_.

**Is the Lease Void?**

As stated _supra_, Defendant argues that the Lease in question was invalid _ab initio_ because it is contrary to City of Naples Ordinances and Resolutions in place at the time of the execution of the Lease.  Naples Code of Ordinances Section 78-84, which was in effect from 1957 through December 19, 2001, states: "The city council shall, by resolution, authorize lease policies and a lease document for the rental of all slips at the municipal dock." (Doc. # 40 at Ex. B).  City of Naples Resolution 94-7108 states that it is "[a] Resolution authorizing the use of a lease document for the rental of commercial slips at the municipal dock, in substantially the form attached hereto; and providing an effective date." (Doc. # 40, Ex. A at 1).

The sample lease document provided in Resolution 94-7108 (the "authorized" or "approved" lease) is different from the 1999 Walburn Lease.  Significantly, the portion of the authorized lease document found in City of Naples Resolution 94-7108 describes the "term" of the lease and states:

> 2. Term.
> 2.1  The term of the Lease shall be for a period of ___ (not more than five) years.  The Lease term shall begin at 12:01 a.m. on the ___ day of _____, 19__, (the "Commencement Date") and shall end at 11:59 p.m. on the ___ day of _____, 19__, (the "Termination Date").

13

(Doc. # 40, Ex. A at 2).[10]

Clearly, the "term" section of the authorized lease agreement differs from the Walburn Lease.  Significantly, the Walburn Lease contains additional language concerning a "rolling lease" and "automatic renewal" that is absent from the authorized lease.  Further, the "term" section of the Walburn Lease contains the following clauses not found in the authorized lease: 2.3, 2.4, and 2.5.  In addition, the authorized lease contains a paragraph titled "new lease notice" which states, inter alia, that the lease shall not renew.[11]  The "new lease notice" paragraph is absent from the Walburn Lease.

In addition, Defendant has pointed out several other

---

[10] Resolution 94-7108 was amended by Resolution 01-9445, which was passed on December 19, 2001.  The language of the sample lease provided in Resolution 01-9445 with regard to the term of the Lease states as follows:

> The term of the Lease shall not exceed 5 years.  The term shall begin on the ____ day of _____, 20__ (the "Commencement Date") and shall end on the ____ day of _____, 20__ (the "Termination Date"), unless sooner terminated in accordance with, and pursuant to, the terms and conditions of this Lease, the Code of Ordinances of the City of Naples, or the duly adopted rules and regulations for the Municipal Dock.

(Doc. # 40, Ex. E at 2).

[11] The "new lease notice" paragraph states, "The lease shall not renew.  The tenant must notify the landlord in writing, no later than 180 nor earlier than 210 days prior to the expiration of the lease period, if a new lease is requested.  Failure to so notify the landlord relieves the landlord of any obligation to consider granting a new lease to the tenant."  (Doc. # 40, Ex. A at 4-5).

differences between the sample lease authorized by the City and the Walburn Lease.  These differences, although less salient than those concerning the lease term and renewal of the lease, are pertinent because they highlight the Walburn Lease's departure from the approved lease.

First, the Walburn Lease lacks the words "For and in consideration of the mutual promises contained herein, and for other good . . ." at line 3, which appear in the approved lease. Second, Paragraph 8.5 of the Walburn Lease lacks the following language which is found in the approved lease: "[I]f the damage or destruction of the Premises, whether total or partial, is the result of negligence or willful misconduct of the Tenant . . . ." Also, the Walburn Lease, in Paragraph 8.5, includes the following language, which does not appear in the authorized lease: "nor shall the Landlord be responsible for the replacement of the Tenant's vessel or personal property."  In addition, the Walburn Lease has added the following sentence at Paragraph 15.2(c), which is not found in the approved lease: "Actual removal of boat and other related devices, as well as failure to pay rent as required herein, will constitute desertion or vacation."  In addition, Paragraph 5 of the approved lease bars transfer or assignment of the lease; however, the Walburn Lease contains a hand-written statement by Plaintiff noting that "Landlord will not unreasonably withhold the assumption of this lease by an approved buyer in event the business

15

at slip 79 is sold." (Doc. # 42, Ex. 2 at 1).

The City argues that the Walburn Lease "deviates substantially" from the approved lease form found in Resolution 94-7108, which was in effect at the time Plaintiff and Defendant signed the Lease agreement in question. Plaintiff asserts in his response to the City's motion for summary judgment that the Walburn Lease's deviations from the authorized lease were minor and that "[t]he changes simply gave the parties the option to roll the five year lease into another five year lease each year if neither party objected." (Doc. # 60 at 5). Defendant persuasively argues that the "rolling lease" terms of the Walburn Lease are unauthorized and substantially deviate from the approved lease. This Court finds that the changes to the authorized lease were substantial.

Having determined that the Walburn Lease was not in compliance with City of Napes Code of Ordinances Section 78-84 and Resolution 94-7108, this Court must now address Defendant's argument that "for a contract or agreement to be binding on the City, it must comply with the City ordinances and resolutions. Neither municipalities nor their subordinate officers can execute binding contracts except in compliance with applicable law." (Doc. # 59 at 4).

Florida law dictates this Court's discussion of the validity of the Walburn Lease. The Florida Supreme Court faced an issue similar to the issue <u>sub judice</u> in the vintage case of <u>Ramsey v. Kissimmee</u>, 190 So. 474, 477 (Fla. 1939). There, the plaintiff, an

engineer, entered into a contract with the city to perform engineering services. The contract was not entered into in the manner prescribed by the city's charter, ordinances, and resolutions, and therefore, the Court determined that the contract was unenforceable.[12]  Though the plaintiff presented several arguments in favor of enforcing the contract, including that the city had ratified the contract by making a partial payment to the plaintiff, the Court clearly ruled, "Persons contracting with a municipality must, at their peril, inquire into the power of the municipality, and of its officers, to make the contract contemplated." Id.  The Court concluded, "The remedy of plaintiffs, if any they have, is on quantum meruit, and not on the contract, and direction of a verdict for the defendant on the count based on the contract would have been proper." Id. at 478.

Along the same lines, several Florida courts have determined that "Agreements entered into by public bodies which fail to comply with statutory requirements are void." Palm Beach County Health Care Dist. v. Everglades Mem'l Hosp., Inc., 658 So. 2d 577, 581 (Fla. 4th DCA 1995)(lease agreement involving a public hospital was void because it was contrary to Florida Statute 155.40); see also McQuillin, The Law of Municipal Corporations, § 29.02 (3d Ed. Rev. 1999)(in order for a contract with a city to be valid, it must

---

[12] In Ramsey, the contract was signed by the Mayor-Commissioner, but the city charter authorized the city commission alone to make the kind of contract that was at issue.

comply with the city charter or ordinances); <u>City of Hollywood v.</u> <u>Witt</u>, 789 So. 2d 1130, 1132 (Fla. 4th DCA 2001)(same); <u>Town of</u> <u>Indian River Shores v. Coll</u>, 378 So. 2d 53, 55 (Fla. 4th DCA 1979)(Court refused to enforce an employment contract between the mayor and an individual because an ordinance required that the type of contract at issue be authorized by the entire town council).

Another relevant case which has addressed the instant issue is <u>City of Panama City v. T & A Utilities Contractors</u>, 606 So. 2d 744 (Fla. 1st DCA 1992).  In <u>T & A Utilities Contractors</u>, the city manager terminated a contract with T & A Utilities Contractors ("the contractors") because the contractors failed to demonstrate that they were using the materials specified in the contract.  The contractors sued and argued that the city manager did not have the authority to cancel a contract.  Notably, the city commission hired new contractors to complete the job.  At trial, the trial court relied on the holding in <u>Ramsey</u>, noted <u>supra</u>, and entered a directed verdict for the plaintiff contractors, ruling that the city manager acted outside of the scope of his authority in cancelling the contract.  The city appealed, and the appellate court determined that the trial court's reliance on <u>Ramsey</u> was misplaced.  <u>Inter</u> <u>alia</u>, the appellate court determined that the city effectively ratified the city manager's <u>ultra</u> <u>vires</u> action of cancelling the contract.  In addition, the appellate court fully explained the ramifications of the <u>Ramsey</u> decision:

18

> Ramsey establishes a rule for cases where an attempt is being made to hold a municipality to the terms of a contract, for the benefit of the other party to the contract. We have found no decision which extends <u>Ramsey</u> to the type of situation presented by this case, where the municipality seeks to terminate a contract because of an alleged breach by the other party. It seems clear to us that the policy justification underlying the Ramsey decision is that taxpayers should not be held accountable on a contract unless the contract has been entered into according to the strict letter of the law. Otherwise, corrupt (or merely inept) public officials could subject the public to untold financial liability.

<u>T & A utilities Contractors</u>, 606 So. 2d at 747.

The <u>T & A Utilities Contractors</u> case went on to explain that "such a concern is not present in a case . . . where the municipality wishes to terminate a contract, previously entered into according to law, because its officials have concluded that the contract has been breached by the other party." <u>Id.</u>

Unlike the <u>T & A Utilities Contractors</u> case, the facts of the present case cannot be distinguished in order to evade the holding in <u>Ramsey</u>. Further, this Court agrees with the <u>T & A Utilities Contractors</u>' reasoning that public policy requires that a municipality's contracts must conform to the "strict letter of the law" to avoid corruption and waste of taxpayer money. <u>Id.</u>

As will be noted <u>infra</u>, after entertaining Plaintiff's unsuccessful equitable estoppel argument, this Court determines that the Walburn Lease, which deviates substantially from the lease approved by the City was void <u>ab</u> <u>initio</u>. Therefore, it is unnecessary to address Defendant's arguments, raised in the

alternative, concerning when the lease, if valid, terminated.

**Plaintiff's Arguments**

Plaintiff contends that the doctrine of equitable estoppel bars the City from arguing that the Lease is void.  In support of this proposition, Plaintiff cites the cases of Hollywood Beach Hotel Co. v. City of Hollywood, 329 So. 2d 10 (Fla. 1976), Sun Cruz Casinos, L.L.C. v. City of Hollywood, 844 So. 2d 681 (Fla. 4th DCA 2003), and Town of Largo v. Imperial Homes Corp., 309 So. 2d 571 (Fla. 2d DCA 1975).[13]

In Hollywood Beach Hotel Co., the plaintiffs prevailed in a suit against the city for unfair dealing, and the court overturned two of the city's zoning ordinances.  The Court discussed the doctrine of equitable estoppel as follows:

> The doctrine of equitable estoppel may be invoked against a municipality as if it were an individual . . . . the doctrine of equitable estoppel will preclude a municipality from exercising its zoning power where "a property owner (1) in good faith (2) upon some act or omission of the government (3) has made such a substantial change in position or has incurred such extensive obligations and expenses that it would be highly inequitable and unjust to destroy the right he acquired."

329 So.2d 15, (citing Salkolsky v. City of Coral Gables, 151 So. 2d 433, 435 (Fla. 1963)(other citations omitted)).

Also pertinent to Plaintiff's case is the statement of the

---

[13] It should be noted that each equitable estoppel case cited by Plaintiff involves zoning, an area of law unto its own.  This Court proceeds with caution in comparing the holdings of these zoning cases with the facts of the instant case.

Hollywood Beach Hotel Co. Court that "[e]very citizen has the right to expect that he will be treated fairly by his government. 'Unfair dealing' by a municipality can also serve as the basis for the invokement of equitable estoppel." 329 So.2d at 18. Plaintiff has not asserted an unfair dealing claim. In Hollywood Beach Hotel Co., the Florida Supreme Court addressed a land owner's claim to a vested right in the continuation of a zoning use when the City altered the zoning law without prior notice to the land owner. This court finds that the facts of Hollywood Beach Hotel Co., which involved zoning, are simply inapposite to the instant case.

Further, this Court is instructed by Eugene McQuillin's authoritative treatise, The Law of Municipal Corporations, in which estoppel is discussed as follows:

> Estoppel may not be available when based upon an illegal act. However, even if estoppel is available when based upon an illegal agreement with the municipality, since the party contracting with the municipality is charged with the knowledge of the City's power to enter into contracts, it cannot claim lack of knowledge to the surrounding facts and circumstances. When a municipality goes beyond the law, the person who deals with it does so at their own risk.

McQuillin, The Law of Municipal Corporations, § 29.02 (3d Ed. Rev. 1999).

In addition, Florida law provides that "the party raising estoppel must prove the required elements by clear and convincing evidence." Sun Cruz Casinos, L.L.C. v. City of Hollywood, 844 So. 2d 681, 684 (Fla. 4th DCA 2003)(citing Watson Clinic, LLP v.

21

<u>Verzosa</u>, 816 So. 2d 832, 834 (Fla. 2d DCA 2002)(also noting, "Equitable estoppel must be applied with great caution").   In the instant case, Plaintiff has neither asserted a single specific argument concerning the elements of equitable estoppel nor pointed to a single piece of evidence in support of his position.[14]

**Conclusion**

Naples Code of Ordinances Section 78-84, which was in effect from 1957 through December 19, 2001, states: "The city council shall, by resolution, authorize lease policies and a lease document for the rental of all slips at the municipal dock." (Doc. # 40 at Ex. B).  Resolution 94-7108 contains the approved lease document required by the above ordinance.  This Court finds that the Walburn Lease substantially deviates from the approved lease mandated by City of Naples' Ordinances and Resolutions, rendering the Walburn Lease void.

Plaintiff's argument that the City is estopped from arguing that the contract is void is without merit.  Further, since the law impresses upon Plaintiff knowledge of the extent of a municipal officer's powers, Plaintiff cannot argue that the City is estopped from arguing that the contract is void.   See <u>Coll</u>, 378 So. 2d 55 ("Nor do we believe that there is any estoppel to appellee because

_____

[14] Plaintiff's memorandum in opposition to Defendant's motions for summary judgment simply states: "Plaintiff and other lessees have detrimentally relied on the circumstances created entirely by the City, and the City is estopped to deny their property rights." (Doc. # 77 at 13).

one who contracts with a municipality is bound to know the limitations of the City's contracting authority.  If the contract is ultra vires then, absent some special estoppel, no liability accrues to the City.")

The cases cited by Plaintiff concerning equitable estoppel are zoning cases and are factually distinguishable from Plaintiff's case.  Further, Plaintiff has failed to even attempt to prove by the required standard of clear and convincing evidence that the City made a material representation, that Plaintiff relied upon it, and that the City thereafter changed its position, causing detriment to Plaintiff.  While the greatest burden in summary judgment proceedings is on the City, Plaintiff is still required to come forward with evidence of each essential element of his claim, such that a reasonable jury could find in his favor.  Walburn has not done so with regards to Count I, or any other count for that matter.

Thus, Defendant is entitled to summary judgment on Count I of Plaintiff's complaint.

In addition, this Court finds that Defendant is entitled to summary judgment on Count III as well.  In Count III, Plaintiff seeks an injunction barring the City from evicting Plaintiff from the location which is the subject of the Lease until this Court has determined the parties' rights under the Lease.  The record shows that Defendant has yet to take any action indicative of an

intention to evict Plaintiff.   Plaintiff stated in his deposition taken on February 10, 2005, that he continues to use the property in question. (Doc. # 102 at p. 10, line 15).   Also, in the City's motion for partial summary judgment, the City represents to the Court that, "Plaintiff remains in possession of his dock slip, until such time as this court construes the purported lease." (Doc. # 56 at 13).

Accordingly, summary judgment is appropriate as to Counts I and III.   The parties entered into a lease contract, and that contract is before the court.   The parties' dispute concerns the validity and terms of the contract.   Viewing all evidence in favor of Plaintiff, Defendant has still demonstrated an absence of disputed of material facts, and has shown that it is entitled to judgment as a matter of law.   Plaintiff has failed to present evidence in support of each essential element of his case, such that a reasonable jury could find in his favor, as required by Earley v. Champion International Corp., 907 F.2d 1077, 1080 (11th Cir. 1990) and other binding cases.   The parties offer differing legal, rather than factual, theories concerning the interpretation of the contract.   As such, it is appropriate for this Court to dispose of Counts I and III via summary judgment.   Walburn has no right to possess the land subject to the Lease in question, and the City is entitled to possession of the land after a thirty day

period.[15]

In addition, this Court determines that each party shall bear its own attorney's fees as the contractual provision for attorney's fees and costs in the Walburn Lease, as with the entire lease, is void.

## C.   **Count II**

### **Introduction**

In Count II of Plaintiff's complaint, he alleges violations of 42 U.S.C. § 1983.  Plaintiff argues that the City interfered with his property rights and also with his first amendment right to "free and unfettered access to the Courts." (Doc. # 2 at ¶ 20).  In addition, Plaintiff alleges in his verified complaint that "the former City manager, who was also the police chief for the City, had the Plaintiff arrested on a criminal charge when he knew that the State Attorney's Office was not going to proceed with the charge thereby violating Plaintiff's Fourth and Fourteenth Amendment rights." (Doc. # 2 at ¶ 21).  Walburn claims that the City tried to intimidate and coerce him into executing a new lease agreement by bringing false and fraudulent charges against him.[16]

---

[15] The Court has determined that it is in the interests of equity to provide Plaintiff some measure of time in which to vacate the premises, as the parties submit that Plaintiff currently occupies the premises in question.

[16] Defendant moved to dismiss Count II, but then answered the complaint. (Docs. # 5 and #8).  Therefore, the motion to dismiss Count II was denied by John E. Steele, United States District Judge, prior to the transfer of this case to the undersigned. (Doc.

With respect to each alleged violation, Plaintiff claims that the City "violated Plaintiff's clearly established constitutional rights of which a reasonable person would have known and further that the City acted with intentional and deliberate indifference to the foreseeable damage which would be done to Plaintiff." (Doc. # 2 at ¶ 23). Plaintiff asserts that he has suffered "emotional distress, mental anguish, embarrassment and damage to his reputation, suffered the loss of his freedom while being placed under arrest, incurred costs and attorney's fees in defending himself, which costs and attorney's fees are ongoing." (Doc. # 2 at ¶ 24).

**Factual Background**

The facts surrounding the majority of Plaintiff's 42 U.S.C. § 1983 claims are sufficiently different from the lease dispute as to warrant a separate factual discussion.

As previously noted, Plaintiff runs a charter business at the City municipal dock. Fleischman's dock is a dock which adjoins the City municipal dock. It is alleged that Plaintiff's dog bit a man named William Pattison ("Pattison") causing Pattison to require medical treatment. See Affidavit of Bill Pattison, dated February 24, 2005. (Doc. 56, Ex. A at 22-23).[17] It is further alleged that

_____

# 13).

[17] Plaintiff commented on the dog bite incident during his deposition: "He [Pattison] was injured by my dog." (Doc. # 102 at p. 26, line 17).

Walburn refused to pay some portion of such bills. (Id.)  On or about June 12, 2001, Pattison served Walburn with a civil complaint for damages from the dog bite. (Id.)  Defendant alleges that Walburn made threats to Pattison's friends and neighbors concerning the dog bite suit. (Id.) Defendant claims that Walburn threatened Pattison's friends and neighbors by stating that if they (Pattison's friends and neighbors) did not convince Pattison to drop the civil suit, he (Walburn) would file complaints with the authorities to get them (Pattison's friends and neighbors) kicked off of the dock. (Id.)

The record contains a plethora of evidence in support of Defendant's factual allegations.  Defendant has filed the affidavit of Bill Pattison in which Pattison succinctly states:

> In 2001 I filed a lawsuit against Mr. Walburn for damages caused when his dog bit.  Mr. Walburn refused to pay a portion of my doctor's bills.  Mr. Walburn threatened people on the Fleishman dock that if I did not change my mind about the lawsuit, that he, Walburn, would file complaints against us for commissions of crimes, and that he would have us kicked off the dock.  Mr. Walburn threatened to file reports with the Florida Department of Environmental Protection and the City of Naples about alleged violations on the dock, and to use his personal influence with City officials, to carry out these goals. He subsequently made such complaints.  After Mr. Walburn made his threats, I made a complaint to the City of Naples Police, and the incident was investigated by officer Mike O'Reilly and Detective Edward Principe.

(Doc. # 56, Ex. A at 22-23).

In addition, the record contains the sworn statements of six individuals who allege that they were threatened by Plaintiff

27

Walburn in relation to the dog bite incident and resulting suit.[18]

Joseph Biasella stated in a sworn statement dated December 8, 2000, that he was the dockmaster at the time of the dog bite.  In the sworn statement Biasella described the nature of Walburn's alleged threats:

> [Walburn stated,] 'If he [Pattison] keeps on[,] I will have him and these other useless motherf**kers thrown off the docks.'  He [Walburn] further stated that as Dockmaster I [Biasella] should evict Mr. Pattison or he [Walburn] would come after me and my business.  Mr. Walburn stated . . . that unless I put pressure on Mr. Pattison to drop his lawsuit, he would bring in agencies and close down the dock and put everyone out of their home.  Mr. Walburn stated to me on this occasion and on many occasions that 'you know what pressure I can bring and will put you and the rest of these homeless vagrants out.' . . . Mr. Walburn has continually been threatening my business and my home and is extorting myself and our tenants to pressure Mr. Pattison to drop his lawsuit.

(Doc. # 56, Ex. A at 17-18).

The record also contains copies of the sworn statements of William Fenwick, Marlena Brackenbusch, Kristina Baker, Dana Wilson, and Robert Roed.  Each statement contains allegations directed at Walburn related to threats.[19]  Plaintiff has not officially objected

---

[18] Each sworn statement is filed in attachment A to Doc. # 56. Defendant submits that Plaintiff's record has been expunged, and that the sworn statements were provided to Defendant by Pattison. Defendant explains that after the investigation of Plaintiff was completed, Detective Principe of the Naples Police Department provided Pattison with a copy of the investigative files.  (Doc. # 56, Ex. A at 23).

[19] For instance, William Fenwick stated, "Mr. Walburn stirs things up threatening people and myself that [he] would get me and the other live aboard people removed from the dock"; Marlena Brackenbusch stated, "He demanded that I speak with Bill Patterson

to the statements of these individuals.   However, in his
deposition, Plaintiff stated that he was charged with extortion
with "false sworn statements." (Doc. # 102 at p. 23, line 23).
When asked at his deposition: "[S]o these five individuals you
believe had some motivation, improper motivation to bring
accusations against you, correct?"   Walburn responded: "Yes."
(Doc. # 102 at p. 33, lines 3-6).

In response to these citizen complaints, Detective Principe of
the Naples Police Department went to Walburn's home to arrest
Walburn.   Detective Principe was not successful in arresting
Walburn; however, Walburn's attorney arranged for Walburn to
surrender himself to the police on and be booked on a charge of
extortion under Florida Statute § 836.05.[20]   After being booked,

_____

[sic] and ask him to withdraw the lawsuit against Mr. Walburn. . .
. He then told me he would have to 'do what it takes to protect his
family.' . . . He tried to coerce me to pressure Bill Patterson
[sic] into dropping his lawsuit."   Kristina Baker stated, "Mr.
Walburn has on two occasions spoken to me and threatened that if
the residents at Fleishman's dock didn't persuade Mr. Patterson
[sic] to drop his lawsuit for medical injuries, quote 'innocent
people are going to get hurt.'" Dana Wilson stated, "Allen Walburn
did state on several occasions that if Bill Pattison did not drop
the lawsuit and accept a reasonable settlement that many of my
neighbors would suffer." Finally, Robert Roed stated, "On numerous
occasions, he has come up and wanted me to talk to Bill and get him
to drop the lawsuit or and, his words were either to the effect
that he could or would make my life miserable or horrible. . . ."
(Doc. # 56, Ex. A at 38-49).

[20]   Florida Statute section 836.05, entitled "Threats;
extortion" states as follows:

Whoever, either verbally or by a written or printed
communication, maliciously threatens to accuse another of

Walburn was released.[21]  The State Attorney never prosecuted Walburn

for the offense, and the felony charge was dismissed on or about

October 15, 2001.[22]

**Legal Standard**

To bring a claim under 42 U.S.C. § 1983, Plaintiff must show

that the City deprived him of his rights guaranteed by the

Constitution or laws of the United States under color of state law.

Loren v. Sasser, 309 F.3d 1296, 1303 (11th Cir. 2002), cert.

denied, 538 U.S. 1057 (2003).[23] "A local government body . . . is

---

any crime or offense, by such communication maliciously
threatens an injury to the person, property or reputation
of another, or maliciously threatens to expose another to
disgrace, or to expose any secret affecting another, or
to impute any deformity or lack of chastity to another,
with intent to compel the person so threatened, or any
other persons, to do any act or refrain from doing any
act against his or her will, shall be guilty of a felony
of the second degree, punishable as provided in s.
775.082, s. 775.083, or s.775.084.

[21] Walburn's deposition testimony supports this Court's
statement of the facts surrounding Plaintiff's arrest/surrender.
(Doc. # 102 at pp. 42-43).

[22] See Walburn's deposition testimony (Doc. # 102 at p. 50,
lines 1-3).

[23] 42 U.S.C. § 1983 provides in pertinent part:

Every person who, under color of any statute, ordinance,
regulation, custom, or usage, of any State . . .
subjects, or causes to be subjected, any citizen of the
United States . . . to the deprivation of any rights,
privileges, or immunities secured by the Constitution and
laws, shall be liable to the party injured in an action
at law, suit in equity, or other proper proceeding for
redress . . . .

liable under 1983 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" Cuesta v. Sch. Bd. of Miami-Dade County, Fla., 285 F.3d 962, 966 (11th Cir. 2002) (citing Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978)). A custom or policy may also be established if the official making the decision has final policy making authority with respect to the decision. Cuesta, 285 F.3d at 968.

Under § 1983, a governmental entity may not be held liable under a theory of respondeat superior, but instead may only be held liable when its "official policy" causes a constitutional violation. Monell, 436 U.S. at 694. Plaintiffs can establish the requisite "official policy" in one of two ways: (1) identifying an officially promulgated policy, or (2) identifying an unofficial custom or practice shown through the repeated acts of the final policymaker of the entity. Grech v. Clayton County, Ga, 335 F.3d 1326, 1320-30 (11th Cir. 2003). Plaintiff must identify the municipal policy or custom that caused his injury so that liability will not be based upon an isolated incident, McDowell v. Brown, 392 F.3d 1289, 1290 (11th Cir. 2004), and the policy or custom must be the moving force of the constitutional violation. Grech, 335 F.3d at 1330; see also Board of County Comm'rs v. Brown, 520 U.S. 397, 403 (1997); Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir.

31

1998).

In sum, "to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted a deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." <u>McDowell</u>, 392 F.3d at 1289 (citing <u>City of Canton v. Harris</u>, 489 U.S. 378, 385 (1989).

## A.    <u>Plaintiff's Claim for Deprivation of "Liberty"</u>

Plaintiff remarked in his response to Defendant's motions for summary judgment that Plaintiff is not seeking to recover for "false arrest; he has sued for wrongful deprivation of his constitutional right to liberty." (Doc. # 77 at 13).   Plaintiff stated in his verified complaint:

> [T]he City, in conjunction with other individuals in a joint concerted action, has attempted to bring false and fraudulent charges against Plaintiff for violation or alleged violation of dock rules which would then give the City the pretext with which to cancel or terminate Plaintiff's lease.   Additionally, the former City Manager, who was also the police chief for the City, had the Plaintiff arrested on a criminal charge when he knew that the State Attorney's Office was not going to proceed with the charge thereby violating Plaintiff's Fourth and Fourteenth Amendment rights.

(Doc. # 2 at ¶ 21).

This court is cognizant of Plaintiff's rights under the

Fourteenth Amendment;[24] however, Plaintiff's claims related to his alleged improper arrest must be decided under the law of the Fourth Amendment.  This Court turns to the reasoning stated in Albright v. Oliver, 510 U.S. 266, 273 (1994) for guidance.  In Albright, the plaintiff surrendered to a police officer after learning that a warrant had been issued for his arrest for drug-related charges. The case against the plaintiff was eventually dismissed, and the plaintiff asserted a section 1983 claim against the officer, claiming that the plaintiff was denied his substantive due process right to "liberty."  The Court determined that the plaintiff's claim should have been construed under the Fourth Amendment rather than the Fourteenth Amendment.  The Court explained: "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of governmental behavior, that Amendment, not the more generalized notion for substantive due process, must be the guide for analyzing these claims." Id. (Internal citations omitted).

This reasoning has been employed by the Eleventh Circuit in several Section 1983 cases in which plaintiffs have asserted claims under both the Fourteenth and Fourth Amendments for the same conduct alleged by the governmental entity. See, e.g., Uboh v.

---

[24] The Fourteenth Amendment provides that no person shall be deprived "of life, liberty, or property, without due process of law."

Reno, 141 F.3d 1000, 1003 (11th Cir. 1998)(determining that a malicious prosecution case should be governed by the Fourth, rather than the Fourteenth Amendment); Tinney v. Shores, 77 F.3d 378, 380-381 (11th Cir. 1996)(characterizing a plaintiff's claim for unlawful seizure of her mobile home as being based on the Fourth rather than the Fourteenth Amendment).

This court will proceed on Plaintiff's liberty claims under the law of the Fourth Amendment. It is not necessary for this Court to go into exhaustive detail concerning Plaintiff's arguments. As stated supra, for Plaintiff to prevail on his Section 1983 claim, he must be able to demonstrate that a policy or custom of the City of Naples deprived him a constitutional right. Cuesta, 285 F.3d at 966. In this case, the Court is convinced that Plaintiff cannot establish that he was deprived of his right to be free from unlawful seizures by any action of the City. Defendant has not sued the arresting officer or any City employee in this action. Instead, Plaintiff has sued the City of Naples. Plaintiff offers only vague and unsupported statements that purport to link the then-City Manger, Kevin Rambosk, who Plaintiff alleges was also being paid as a police chief, to Plaintiff's arrest.[25] In addition,

---

[25] Plaintiff asserts that the City possessed the motive to harass plaintiff and that its actions, which led to Plaintiff's arrest were an abuse of executive power. (Doc. # 77 at 13). There is no evidence that the City sought to harass Plaintiff. However, even if Plaintiff's assertion were correct, as this Court will explain infra, the law of this Circuit is clear that motive is irrelevant to probable cause determinations.

34

Plaintiff asserts that the City "manipulated the circumstances to try to create the impression of probable cause." (Doc. # 77 at 3-4). The record contains an affidavit submitted by Gerald Berry, Esq., who represented Plaintiff in relation to the extortion claim and arranged for Plaintiff to surrender to the police. (Doc. # 70). Attorney Berry stated in his affidavit that he did not believe that probable cause existed to arrest Plaintiff for extortion. (Id.) During Attorney Berry's deposition, however, he stated that at the time he expressed his opinion concerning a deficiency with regard to probable cause, he had not seen the sworn statements mentioned infra. (Doc. # 97 at p. 26, lines 5-13).

This Court "need not entertain conclusory and unsubstantiated allegations of fabrication of evidence." Kingsland v. City of Miami, 382 F.3d 1220, 1227 (11th Cir. 2004). Notably, when Plaintiff was asked at his deposition: "[W]hat evidence do you have that anyone acting on behalf of the city had some practice or policy or custom of bringing false charges against you to have you arrested?" Plaintiff responded: "I don't know that I have any evidence." (Doc. # 102 at p. 50, lines 18-22).

Aside from the fact that Plaintiff has failed to point to a custom or policy that can be related to his arrest, it is patently clear that the arrest of Plaintiff was with probable cause. "The existence of probable cause at the time of the arrest . . . constitutes an absolute bar to a section 1983 action for false

arrest." <u>Kingsland</u>, 382 F.3d at 1226.   This is so regardless of whether the arresting officer acted maliciously or in bad faith. <u>See</u> <u>Whren v. United States</u>, 517 U.S. 806, 813 (1996) ("subjective intent alone does not make otherwise lawful conduct illegal or unconstitutional. . . . [T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify the action.")(internal citations omitted); <u>Howell v. Tanner</u>, 650 F.2d 610, 614-615 (5th Cir. Unit B, July 13, 1981)("The defense of probable cause negates a § 1983 claim based on an alleged false arrest.   Once probable cause has been established, the legality of the arrest is not affected by collateral bad faith of the arresting officer of a subsequent dismissal of the charges.")(internal citations omitted).[26]

The law is clear that "[p]robable cause to arrest exists when an arrest is objectively reasonable based on the totality of the circumstances.   This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect

---

[26] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted all cases decided by the Fifth Circuit Court of Appeals prior to the close of business on September 30, 1981, as binding precedent.

has committed, is committing, or is about to commit an offense."
Kingsland, 382 F.3d at 1226 (internal citations omitted).

Further, not everyone who is arrested but not convicted has a
cause of action for violation of Section 1983.  The Constitution
does not guarantee that only the guilty will be arrested.  Baker v.
McCollan, 443 U.S. 137, 145 (1979).

The aforementioned sworn statements of the citizens of
Fleischman dock constitute a sufficient basis for establishing
probable cause to arrest Plaintiff.  See, Ill. v. Gates, 462 U.S.
213, 241-242 (1983)("an affidavit relying on hearsay is not to be
deemed insufficient on that score, so long as a substantial basis
for crediting the hearsay is presented. . . . [E]ven in making a
warrantless arrest an officer may rely upon information received
through an informant, rather than his direct observations, so long
as the informant's statement is reasonably corroborated by other
matters within the officer's knowledge.")(internal citations
omitted).[27]

Therefore, Defendant is entitled to summary judgment on the
issue of Plaintiff's false arrest claim.

B.    **Plaintiff's Property Interest Argument**

Pursuant to this Court's ruling that the Lease was void ab

---

[27] The Court in Gates, further explained: "[I]f an
unquestionably honest citizen comes forward with a report of
criminal activity–which if fabricated would subject him to criminal
liability–we have found rigorous scrutiny of the basis of his
knowledge unnecessary." 462 U.S. at 233.

_initio_, it is axiomatic that Plaintiff's claim that the City interfered with his property rights in relation to the Lease cannot prevail.  The City is entitled to summary judgment on Plaintiff's claims that the City interfered with his property rights, as Plaintiff had no property rights in the property at issue in this case.

C.   **Plaintiff's Access to the Courts Argument**

Plaintiff argues that the City's "threat to treat the 1999 Lease as terminable at will if Plaintiff chose to ask the Court to interpret and determine the respective rights of the parties in regard to the 1999 Lease violated Plaintiff's right to free and open access to the Courts in violation of the First Amendment to the United States Constitution." (Doc. # 2 at ¶ 22).  Plaintiff refers to a July 24, 2003, letter sent to Plaintiff by the Community Services Department Director (at that time, David Lykins) which states: "If you wish to resolve the matter through litigation, it is certainly your right to do so.  However, be advised that if it is judicially determined that the City Manager was without authority to enter into the lease and without authority to enter into a perpetual lease, it is the City's position that the tenancy is terminable at will." (Doc. # 2, Ex. D at 2).

Plaintiff's claim that the Defendant has impeded his

Constitutionally protected right to access the courts[28] due to the above language in the City's July 24, 2003, letter is invalid.  The Supreme Court has identified two categories of claims for interference with access to the courts: "In the first are claims that systematic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time. . . .  The second category covers claims not in aid of a class suits yet to be litigated, but specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." Christopher, 536 U.S. at 413-414.  The mere fact that Plaintiff's case is before this Court belies any claim Plaintiff may have that the City interfered with his right to access the court.  Plaintiff has not alleged that Defendant has placed obstacles in Plaintiff's path to litigation.  Plaintiff is currently litigating this case.  Summary judgment is therefore granted in favor of Defendant on Plaintiff's claim that Defendant interfered with Plaintiff's right to access the Court.

In sum, Defendant is entitled to summary judgment on each of Plaintiff's claims that Defendant violated Plaintiff's rights secured by the Constitution.

_____

[28] As the Supreme Court has noted, its decisions have "grounded the right of access to courts in the Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, the Fourteenth Amendment Equal Protection Clause and Due Process Clauses." Christopher v. Harbury, 536 U.S. 403, 415 (2002)(internal citations omitted).

## IV.  <u>Request for Judicial Notice</u>

The City requests that this Court take judicial notice of the following adjudicative facts:

(1)  Chapter 78, Code of Ordinances, City of Naples (1999);

(2)  City of Naples Ordinance No. 94-7134; and

(3)  City of Naples Resolution No. 94-7108.

(Doc. # 38).

Federal Rule of Evidence 201 governs judicial notice of adjudicative facts, and states as follows:

> **(a) Scope of rule.**  This rule governs only judicial notice of adjudicative facts.
> **(b) Kinds of facts.**  A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
> **(c) When discretionary.**  A court may take judicial notice, whether requested or not.
> **(d) When mandatory.**  A court shall take judicial notice if requested by a party and supplied with the necessary information.
> **(e) Opportunity to be heard.**  A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed.  In the absence of prior notification, the request may be made after judicial notice has been taken.
> **(f) Time of taking notice.**  Judicial notice may be taken at any stage of the proceeding.

Plaintiff has failed to object to the City's request for judicial notice.  The above-noted municipal documents are capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned.  In addition, the City

has furnished copies of the municipal documents at issue. Thus, the Court will take judicial notice of Chapter 78, Code of Ordinances, City of Naples (1999); City of Naples Ordinance No. 94-7134; and City of Naples Resolution No. 94-7108.

**Conclusion**

Accordingly, it is now

**ORDERED, ADJUDGED, and DECREED:**

1. Defendant City Of Naples' Motion for Partial Summary Judgment (Doc. # 55) and Motion for Summary Judgment (Doc. # 59) are **GRANTED**.

2. All other pending motions are **DENIED** as moot.

3. The Clerk of Court is directed to close this case and enter judgment accordingly.

**DONE** and **ORDERED** in Chambers in Ft. Myers, Florida, this 22nd day of September, 2005.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:

All Counsel of Record

41